# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

JOSE LUIS ORTIZ,

     Petitioner,

v.                                                                CASE NO. 8:06-CV-1021-T-27TGW

SECRETARY, DEPARTMENT OF
CORRECTIONS,

     Respondent.

_____/

## ORDER

     Petitioner, an inmate of the Florida penal system proceeding *pro se,* initiated this action by filing a Petition for Writ of Habeas Corpus (hereinafter "petition") pursuant to 28 U.S.C. § 2254 (Dkt. 1). Petitioner challenges his 2002 convictions for two counts of lewd molestation entered by the Tenth Judicial Circuit Court, Polk County, Florida. Respondent has filed a response to the petition (Dkt. 8), and Petitioner has filed a reply thereto (Dkt. 13). The matter is now before the Court for consideration on the merits.

     A recitation of the procedural history of Petitioner's criminal convictions is not necessary to the resolution of his habeas claims because Respondent does not dispute the timeliness of the petition or assert that the claims are not exhausted in state court. Furthermore, an evidentiary hearing is not required for the disposition of this matter. Rules Governing Section 2254 Cases 8(a) (2009).

### Standards of Review

     Under 28 U.S.C. § 2254(d) and (e) as amended by the Antiterrorism and Effective Death

Penalty Act of 1996 ("AEDPA"), this Court's review of the state court's factual findings must be highly deferential. Such findings are presumed to be correct unless rebutted by clear and convincing evidence. Similarly, the state courts' resolutions of issues of law-including constitutional issues-must be accepted unless they are found to be "contrary to" clearly established precedent of the Supreme Court of the United States or involved an "unreasonable application" of such precedent. *Williams v. Taylor*, 529 U.S. 362 (2000). It is not enough that the federal courts believe that the state court was wrong; it must be demonstrated that the state court decision was "objectively unreasonable." *Id. Breedlove v. Moore*, 279 F.3d 952 (11th Cir. 2002).

## Ineffective Assistance of Counsel Standard

To prevail on a claim of ineffective assistance of trial or appellate counsel,[1] a Petitioner must meet the two-part test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *Strickland's* two-part test requires a Petitioner to demonstrate that counsel's performance was deficient and "there was a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* However, if a claim fails to satisfy the prejudice component, the court need not make a ruling on the performance component.

## Discussion

## Ground One

Petitioner asserts that his trial attorney provided ineffective assistance when he conceded Petitioner's guilt during closing argument. In his petition, Petitioner does not provide any facts to

---

[1]The *Strickland* standard of review applies to ineffective assistance of appellate counsel claims. *See Heath v. Jones*, 941 F.2d 1126, 1130 (11th Cir. 1991), *cert. denied*, 502 U.S. 1077 (1992).

support his claim.[2] In his reply, however, Petitioner does identify his attorney's statement which Petitioner claims was an admission of Petitioner's guilt (Dkt. 13 at pg. 2).

In Petitioner's state postconviction motion, and in his reply in the instant action, he asserted that his attorney's statement that "[t]hat's not a crime to fall and hit someone, to fall, or in getting back up in the dark, to touch them" was an admission of Petitioner's guilt (Dkt. 10, Ex. 5 at pg. 5). In denying the claim, the state trial court found:

> First, Defendant claims the attorney was ineffective for conceding Defendant's guilt before the jury. Recent case law does in fact suggest this tactic is improper. However, a close reading of this portion of the motion indicates this is not what happened at all. Defendant was accused of touching his two nieces in a lewd fashion. The quotes attributed to defense counsel do not amount to a concession of guilt. Rather, counsel is alleged to have stated that Defendant could have accidentally, and without the necessary lewd intent, fallen onto the two girls.

(Dkt. 10, Ex. 6 at pg. 1).

The trial transcript supports the state trial court's finding that, when taken in context, trial counsel's statement was not a concession of guilt, but instead was an argument that if Petitioner had touched the girls, it was accidental, and therefore the State failed to prove the intent element of the offense (See Dkt. 10, Ex. 17, Vol. III at transcript pages 282-84). Petitioner fails to demonstrate his attorney's performance was deficient, or prejudice.

Petitioner fails to show that the state court's denial of this claim was contrary to or an unreasonable application of the *Strickland* test. Accordingly, Ground One does not warrant habeas corpus relief.

**Ground Two**

---

[2]Petitioner did not file a supporting memorandum of law with his Section 2254 petition.

In Ground Two, Petitioner claims trial counsel was ineffective in failing to object to the state

trial court's inadequate *Nelson* inquiry.[3]  In denying this claim, the state trial court found:

> Next, Defendant contends the attorney was deficient for not properly objecting to "an
> inadequate *Nelson* inquiry." Apparently defendant was dissatisfied with Mr.
> Averbuck's services and wanted someone else. Defendant cannot have it both ways.
> This Court is unaware of any case law that imposes upon an about-to-be-fired Public
> Defender the obligation to assist the Court in conducting a "proper" *Nelson* hearing.
> A *Nelson* colloquy is either adequate or it is not, and published case law suggests the
> Courts of Appeal will examine such colloquies even if the attorney (who faces
> something of a no-win situation at this juncture) stands silent.

(Dkt. 10, Ex. 6 at pg. 1).

Under Florida law, when a defendant indicates to the trial judge prior to the commencement

of trial that he desires to discharge court appointed counsel, the trial judge, in order to protect the

indigent's right to counsel, must make an inquiry of defendant as to the reason for his request. If the

court finds that a valid reason exists, it should appoint a substitute attorney who is then allowed

adequate time to prepare the defense. If no valid reason appears, or defendant did not state a reason,

the state trial court must advise defendant that if he discharges his original counsel he is not entitled

to appointment of counsel at the State's expense. *See Hardwick v. State*, 521 So. 2d 1071 (Fla. 1988)

(adopting the procedure announced in *Nelson v. State*, to be followed when a defendant complains

that appointed counsel is incompetent).

Disagreement with trial counsel's strategy alone is not sufficient to require a *Nelson* hearing.

*Morrison v. State*, 818 So.2d 432 (Fla.), *cert. denied*, 537 U.S. 957 (2002). If after being advised that

he will not be appointed new counsel, a defendant continues to demand dismissal of court appointed

---

[3] *Nelson v. State,* 274 So. 2d 256 (Fla. 4th DCA 1973)(establishing the procedures to be followed in
Florida courts when a defendant seeks to discharge court-appointed counsel on grounds of ineffective assistance).

counsel, the trial judge may, in his discretion, discharge counsel and require the defendant to proceed to trial pro se. *See Williams v. State*, 427 So. 2d 768 (Fla. 2d DCA 1983); *Nelson v. State*, 274 So. 2d 256 (Fla. 4th DCA 1973).

The record reflects that the state trial court followed this procedure (Dkt. 10, Ex. 17, Vol. II at pgs. 90-92). To the extent Petitioner alleges the *Nelson* inquiry was inadequate under Florida law, the claim does not provide a basis for federal habeas relief. He must point to rights secured by the federal constitution that have been violated. To the extent he is claiming ineffective assistance of counsel in failing to object to an inadequate *Nelson* inquiry, Petitioner cannot show deficient performance by counsel because he cannot show that counsel had any duty to ask for a *Nelson* hearing, or object to the inadequacy of such a hearing. *Nelson* held that "where a defendant, before the commencement of a trial, makes it appear to the trial judge that he desires to discharge his appointed counsel, *the trial judge . . .* should make an inquiry." 274 So.2d at 258 (emphasis added). Petitioner has presented no authority for his proposition that counsel somehow had the duty to initiate or object to the inadequacy of a *Nelson* hearing. He therefore fails to show ineffective assistance of counsel.

A state prisoner seeking habeas relief in a federal court carries the burden of establishing that the state court's resolution of his claim was contrary to, or an unreasonable application, of federal law. Petitioner has not met this burden as to Ground Two.

**Ground Three**

Petitioner alleges trial counsel was ineffective in failing to object to or use a peremptory challenge striking Juror Marcum after Petitioner made counsel aware that a conflict of interest existed because Marcum did business and socialized with the family of a witness in the case. In

denying this claim, the state trial court stated:

> In ground three of the motion Defendant claims that a prospective juror named Marcum was the owner of a trucking company and that he associated and/or did business with the family of Leinani McKenzie, a *Williams* Rule witness. However, when informed of this counsel did not challenge the juror. This portion of the motion is insufficient on its face. The fact that someone is an acquaintance or business associate of a witness does not ipso facto require his dismissal from a jury venire. It is not asserted, for example, that Mr. Marcum was aware that Leinani McKenzie had been the victim of a crime or that Defendant was the perpetrator.

(Dkt. 13, Ex. 6 at pg. 2).

Petitioner's claim of ineffective assistance of counsel is grounded in the claim that counsel failed to strike a biased juror. To maintain a claim that a biased juror prejudiced him, however, Petitioner must show that the juror was actually biased against him. *See Smith v. Phillips*, 455 U.S. 209, 215 (1981). Petitioner has never shown that Juror Marcum was actually biased, and thus has failed to show that Juror Marcum's presence on the jury prejudiced him.

Petitioner fails to establish that the state court's decision denying this claim was an unreasonable application of federal law. Accordingly, Ground Three does not warrant habeas corpus relief.

**Ground Four**

Petitioner asserts trial counsel was ineffective in failing to file a motion in limine to exclude or move to suppress the testimony of Jeff Bachelder ("Bachelder"). In denying this claim, the state trial court stated:

> In ground four of the motion Defendant complains that counsel failed to move the suppression of the testimony of Jeff Bachelder. Bachelder interviewed Corina [sic] and Juanita Bejar, the victims in this case, at the behest of the Frostproof Police Department. Defendant quotes several instances from the record which contain, in his view, "inconsistencies" in the girl's testimony. However, Defendant provides no basis for concluding that a motion to suppress or motion in limine would have been

successful. Moreover, Defendant fails to establish that the admission of this child-hearsay evidence was improper, and thus cannot demonstrate that counsel was ineffective for not objecting to it.

(Dkt. 13, Ex. 6 at pg. 2).

Following a hearing prior to trial, the state trial court found Juanita Bejar's hearsay statements to Bachelder inadmissible, but found Corrina Bejar's hearsay statements to Bachelder admissible pursuant to Florida Statute, Section 90.803(23).[4] (Dkt. 13, Ex. 17, Vol. I at pgs. 134-36). This Court does not sit as a court of appeal of state court evidentiary rulings. Those matters are to be

---

[4]Section 90.803(23) states:

(23) HEARSAY EXCEPTION; STATEMENT OF CHILD VICTIM.

(a) Unless the source of information or the method or circumstances by which the statement is reported indicates a lack of trustworthiness, an out-of-court statement made by a child victim with a physical, mental, emotional, or developmental age of 11 or less describing any act of child abuse or neglect, any act of sexual abuse against a child, the offense of child abuse, the offense of aggravated child abuse, or any offense involving an unlawful sexual act, contact, intrusion, or penetration performed in the presence of, with, by, or on the declarant child, not otherwise admissible, is admissible in evidence in any civil or criminal proceeding if:

1. The court finds in a hearing conducted outside the presence of the jury that the time, content, and circumstances of the statement provide sufficient safeguards of reliability. In making its determination, the court may consider the mental and physical age and maturity of the child, the nature and duration of the abuse or offense, the relationship of the child to the offender, the reliability of the assertion, the reliability of the child victim, and any other factor deemed appropriate; and

2. The child either:

a. Testifies; or

b. Is unavailable as a witness, provided that there is other corroborative evidence of the abuse or offense. Unavailability shall include a finding by the court that the child's participation in the trial or proceeding would result in a substantial likelihood of severe emotional or mental harm, in addition to findings pursuant to s. 90.804(1).

(b) In a criminal action, the defendant shall be notified no later than 10 days before trial that a statement which qualifies as a hearsay exception pursuant to this subsection will be offered as evidence at trial. The notice shall include a written statement of the content of the child's statement, the time at which the statement was made, the circumstances surrounding the statement which indicate its reliability, and such other particulars as necessary to provide full disclosure of the statement.

(c) The court shall make specific findings of fact, on the record, as to the basis for its ruling under this subsection.

resolved by state courts because they concern state law issues. *See Breedlove v. Moore*, 279 F.3d 952 (11th Cir. 2002). Federal courts in habeas corpus proceedings do not sit to review state evidentiary questions unless the alleged error is of such magnitude as to render the state court defendant's trial fundamentally unfair. *See Estelle v. McGuire*, 502 U.S. 62, 72 (1991).

Petitioner wholly fails to demonstrate that Bachelder's testimony regarding Corrina Bejar's statements was inadmissible under Florida law. Therefore, he cannot show counsel's performance was deficient in failing to file a motion in limine or move to suppress Bachelder's testimony. Moreover, in light of the other State witnesses' testimony during trial, Petitioner fails to show prejudice because he does not demonstrate that the admission of Bachelder's testimony regarding Corrina Bejar's statements rendered the trial "fundamentally unfair."

Accordingly, Ground Four must be denied.

## Ground Five

Petitioner contends trial counsel was ineffective in failing to impeach State witnesses regarding their inconsistent and conflicting molestation allegations and the investigation by authorities. In his reply, Petitioner specifies that trial counsel was ineffective in failing to impeach:

1) Juanita Bejar, who testified at trial that she saw Petitioner running from the scene of the incident, with her statement to Bachelder that she was asleep until the police arrived;[5]

2) Corrina Bejar, who testified at trial that she was able to identify the Petitioner because moonlight came into the room from the outside, with her statement to Bachelder that she was able to

---

[5]Petitioner also states that Juanita Bejar, one of the victims, made no allegations at trial that Petitioner touched her (Dkt. 13 at pg. 10). Petitioner does not, however, identify any inconsistent statements made by Juanita Bejar regarding the issue of whether Petitioner touched her.

see Petitioner because "it was getting to morning."[6]

(Dkt. 13 at pgs. 10-11).

The state court denied this postconviction claim as follows:

6. Defendant correctly states that Juanita Bejar, the younger of the two victims, "made no allegations ... at trial that the Defendant touched her on or about November 6, 1999." Instead, allegations regarding molestation off Juanita came from her colder [sic] sister and co-victim, Corrina. As the following transcript excerpt indicates, Juanita appears to have slept through much of this incident. As to whether Juanita, who was not quite nine years old on the date of a trial - itself held nearly three years after the incident - "openly admitted to lying to the jury when she testified that she saw the Defendant leaving the crime scene running," that is at least the "spin" that Defendant places on the following testimony:

Q: And was he [Defendant] still on the floor, or did he stand up or sit down or

something else?

A: He came out of the room.

Q: He came out of the room? Okay. On his hands and knees, or was he walking?

A: He was walking.

Q: When she [victim's mother] was yelling at him, did he yell back at her or say

anything, or just stay quiet?

A: He ... went out and started running.

Q: He started running?

A: (Nods head.)

Q: Okay. Do you know why he left? Did he make up his own mind to leave, or did

---

[6]Petitioner also asserts Corrina Bejar "testified at trial that petitioner had touched her and Juanita at the same time; she didn't wear a belt, but her pants were unbuckled and zipped; she also felt a hand on her breast. Corrina also stated that when her mother turned on the lights, the petitioner was crawling on his hands and knees towards a room... (Dkt. 13 at pgs. 10-11). Petitioner does not, however, specify any inconsistent statements made by Corrina Bejar regarding these issues.

someone tell him to leave or what?

A: My mom told him to leave.

Q: How do you know he was running?

A: I don't know if he was running.

Q: Okay. You just kind of threw that in there?

A: (Nods head.)

Q: Okay. It's very important you tell us ... only what you remember and really know, okay?

A: (Nods head.)

Q: All of the things you've told us about waking up and seeing your uncle crawling, was that something you remembered, or something that someone told you?

A: I remember it.

Q: Okay. And do you remember your sister screaming, or did someone tell you that?

A: I remember that she was screaming.

Q: Now, before you woke up, did you see what your uncle was doing? Did you see it with your eyes before you woke up?

A: Yeah.

Q: While you were asleep you saw what he was doing?

A: No, when I woke up.

. Q: Okay. What I'm asking is while you were sleeping, do you know what he was doing?

A: No. (T190-1).

However one wants to characterize this testimony, the jury heard it and could judge for themselves. The specific grievance with counsel is that he allegedly failed to impeach Juanita by statements made to Bachelder that she remained asleep until the police arrived. The source for this information is page 18 of Bachelder's deposition, in which he did state, "She said she woke up when the cops came. So she had apparently been asleep up until that time." Defense counsel did not ask Juanita about this statement. The Court cannot conceive of this making any difference in the outcome of the case. All that was proved by Juanita's testimony was that her sister screamed and Defendant was present in the room. Not only did other witnesses testify to these same facts, Defendant himself admitted them.

7. Finally, the Court considers the testimony of Corrina Bejar, the only witness who gave first-hand details of the lewd batteries. Defendant cites three specific instances in which her trial testimony deviated from prior statements. First, she testified that Defendant touched her and Juanita "at the same time," whereas she may have told her mother that Defendant touched Juanita first, then her. At the outset the Court is not convinced this is a genuine inconsistency, assuming both touchings occurred fairly contemporaneously. The child's exact testimony is as follows:

Q: Tell me what you remember now. You were asleep, so how do you know

something happened to you that you didn't like?

A . Because I felt it.

Q: You felt it. Alright. Where did you feel something?

A: (Crying.)

Q: It's okay. It's okay to say ... wherever it is that you felt something. Was it on top of

your head?

A: (No response.)

Q: Was it on your hands?

A: (No response.)

Q: Can you tell these people over here In the jury box where you touched - where you

felt something?

11

A: (No response.)

Q: Can you point?

A: Right there and right here.

Q: Okay. Where were you pointing to?

A: (No response.)

Q: Do you have a word for that part?

A: My chi-chis.

Q: Chi-chis? And where are your chi-chis? Are they on the middle part of your body, the top part of your body, the bottom part of your body?

A: Top.

Q: The top? Okay. Is there clothing that covers your chi-chis?

A: (Nods head.)

Q: What part - what piece of clothing covers your chi-chis?

A: Bra.

Q: A bra? Okay. When you felt something on your chi-chis, was it on top of your clothes or under your clothes?

A: Under

Q: And do you know what it was that you were feeling?

A: (Crying.)

Q: Do you know, Corrina? It's okay. Take your time. What did you feel on your chi-chis?

A: A hand.

12

Q: And can you tell the jury what the hand was doing?

A: Touching my chi-chis.

Q: Was it still or was it moving or something else?

A: Moving.

Q: Moving? Do you know whose hand it was?

A: My uncle's.

Q: I'm sorry?

A: My uncle's.

Q: A different uncle than who is in court today or the same uncle?

A: Same.

Q: How do you know it was your uncle, if it was dark?

A: Because there was light coming through the door and I saw his face.

Q: Did your sister see what happened?

A: She was asleep.

Q: Did you see anything else besides your uncle, and his hand touching your chi-chis?

A: He was touching my sister, too.

Q: Where was he touching your sister?

A: The same.

Q: The same?

A: (Nods head.)

Q: Was it on her chi-chis, you mean?

A: (Nods head.)

Q: All right. Was he touching her chi-chis on top of her clothes or under her clothes?

A: Under.

Q: And how did you see that? Was that before he touched your chi-chis, after he touched your chi-chis, at the same time?

A: He had both hands at the same time.

Q: It was at the same time?

A: (Nods head.)

Q: What did you do when you felt that and saw your uncle there? Well, let me ask - before you answer that question, where was your uncle? Was he sitting on the couch with you, or standing up or something else?

A: He was on his knees on the floor.

Q: And was he facing you on the couch, or was his back to you, do you remember?

A: He was facing me.

Q: And did he have any clothes on?

A: (Nods head.) Yes.

Q: Okay. What were you wearing, do you remember?

A: (Shakes head.)

Q: Did you have clothes on?

A: Yes.

Q: Did you have nightclothes on or day clothes on?

A: Day clothes.

Q: Do you remember if it was a dress or pants and a shirt or ...

14

A: I think it was pants.

Q: Do you wear anything with your pants?

A: My underwear.

Q: Okay. What about the top, do you remember what you had up top?

A: A shirt

Q: Back then, did you wear a bra?

A: No, I was little.

Q: Now, do you wear a belt or anything with your pants?

A: No.

Q: Were they pants that snapped or zipped?

A: Snapped.

Q: Do you know whether you noticed when you woke up, were your clothes on or off or changed?

A: They were on, but my pants were unbuckled or ...

Q: Okay. When you say your pants were unbuckled, what do you mean?

A: They were unbuckled.

Q: When I think of unbuckled, I think of a belt. Is that what you mean?

A: No.

Q: Was your belt unbuckled?

A: No.

Q: What do you mean by unbuckled?

A: My zipper was down and my pants were unbuckled.

Q: But when you woke up, what you felt was on your chi-chis, is that right?

A: Yes.

Q: Okay. When you woke up and felt that, did you say anything?

A: I called my mom.        (T166- 71).

Assuming any meaningful inconsistency exists between the two statements, the sole source for the alleged prior inconsistent statement is the report of the investigating officer, Billy Hood. While this report is not in the record, the motion itself asserts that Hood was interviewing the victim's mother and not the victim herself. Whether Corrina could have been successfully "impeached" by something her mother told Officer Hood is highly debatable.

8. The above-quoted passage also contains all trial references to what the child was wearing on the night of the incident. As can be seen, she persisted in using the term "unbuckled" although she did not claim to have been wearing a belt. According to the motion, there was actually evidence that she did wear a belt. Defendant cites the deposition of James Brimlow of the Frostproof police department, which is attached hereto as Appendix A. Although he observed the two victims, Brimlow did not recall what they were wearing (p. 7, l. 15). He did state that "one of the girls apparently had pants on, shorts with belt loops, because she was wearing a belt," but he did not actually see a belt (p. 7, ll. 18-21). Thus, again it is difficult to see how the witness could have been impeached based on something a police officer could not even recall having seen.

9. The transcript also makes it clear that the victim recalled only having been touched on her breasts, which she called "chi-chis." Defendant contends that "[o]n virtually every police report Corrina alleged Defendant touched her on her private area where she pees." Unlike other portions of the motion, no specific report is identified or quoted from. Police reports themselves are not on file, but the record does contain the depositions of Officers Brimlow and Hood plus the child protection specialist Bachelder. Brimlow was in training at the time of the offense and did not question the victims personally (p. 6, l. 21). The relevant portions of Hood's deposition are attached as Appendix B. Hood first ascertained from the victims' mother that Defendant "touched [Corrina] inappropriately" (p. 10, ll. 15-1 7). Corrina apparently told her mother that Defendant "touched her on her breast area and unbuckled her pants" (p. 11, ll. 4-6). Hood conducted only a brief interview with the girls before passing them on to the child protection team (p.12, ll. 11-13). Although Hood appears to express confusion as to exactly which child said what, the only accusation against Defendant was that he touched the girls' breasts (see generally p. 15). The relevant portions of Bachelder's deposition are attached as Appendix C. As

16

to where the child claimed to have been touched there is no appreciable variation between the child's testimony or the Hood deposition.

10. Finally, there are apparent discrepancies about the child's ability to have seen the Defendant. At trial Corrina stated that she saw Defendant crawling on his hands and knees "toward a room" once her mother turned on a light. She may have also said that she could see "because moonlight came into the room from the outside" and/or "because it was getting to morning." Once again it is difficult to ascribe much value to this potential impeachment material. Had this been a case where identity was the issue, the Court might feel otherwise. But, as noted, even Defendant admitted being at the scene. The sole factual dispute in this case was whether Defendant committed a lewd battery or merely tripped and fell near where the two victims were sleeping. Is it possible that Corrina might have been viewed as somewhat less credible had the jury known of her out-of-court statements about "moonlight" and "morning"? Perhaps. But other factors - such as the fact victim made an immediate and virtual "excited utterance" report of the assault and then repeated the details without significant variation, the availability of *Williams* Rule evidence, and the Defendant's own possible intoxication at the time of the offense - convince the Court that the same outcome would have been reached. Therefore, counsel did not render ineffective assistance.

(Dkt. 10, Ex. 11).

To the extent Petitioner argues that Juanita Bejar's statement at trial that she saw Petitioner running from the scene of the incident, and Corrina Bejar's statement at trial that she was able to see Petitioner because of the moonlight, were inconsistent with their prior statements, Petitioner fails to establish prejudice as a result of counsel's failure to impeach them with prior statements. In light of Petitioner's own testimony that he had fallen near the two victims and crawled on the floor (Dkt. 10, Ex. 17, Vol. III at pg. 254), and the victims' mother's testimony that she turned on the light and saw Petitioner crawling on the floor away from the couch where the two victims had been sleeping (Dkt. 10, Ex. 17, Vol. II at pg. 135), it is objectively reasonable to conclude that there was no reasonable probability that impeaching Juanita and Corrina Bejar with their relatively minor inconsistent statements would have changed the outcome of the trial. The identity of the perpetrator was not a

17

disputed issue in the case. Likewise, there was no reasonable probability that impeaching Corrina Bejar with her relatively minor inconsistent statements, if there were any, regarding which victim Petitioner touched first, and whether or not she was wearing a belt, would have changed the outcome. Finally, Petitioner wholly fails to establish Corrina Bejar made any inconsistent statements regarding the parts of her body Petitioner touched.

Petitioner fails to establish that the trial court's denial was either contrary to or an unreasonable application of *Strickland* or resulted in a decision that is based on an unreasonable determination of the facts. Accordingly, Ground Five must be denied.

**Ground Six**

Petitioner claims trial counsel was ineffective in failing to object to and move for mistrial as a result of testimony regarding the victims' credibility and ability to determine truth from lie. In his petition and reply, Petitioner fails to identify the testimony which he finds objectionable. However, in his state postconviction motion, Petitioner challenged Bachelder's testimony that Corrina Bejar "was able to differentiate the difference between telling the truth and telling a lie." (Dkt. 10, Ex. 5 at pg. 29). The state court denied this claim as follows:

> Finally, ground six of the motion complains that counsel failed to object when evidence came forth that one of the victims could distinguish truth from a lie. It must be remembered that this was an underage witness. The ability to make such a distinction is one of the hallmarks of competency of a witness. Defendant, though characterizing this evidence as mere bolstering of credibility, fails to demonstrate that a different outcome would have likely had the objection been made.

(Dkt. 10, Ex. 6 at pg. 2).

Petitioner argues that under Florida law, witnesses are prohibited from testifying as to a child's ability to distinguish between the truth and a lie. Petitioner is incorrect. Under Florida law,

18

"[a]n expert may testify concerning a child's ability to comprehend the difference between telling the truth and telling a lie for purposes of determining whether the child is competent to testify at trial. It is well established, however, that an expert is prohibited from commenting to the fact-finder as to the truthfulness or credibility of a witness's statements in general." *State v. Townsend*, 635 So. 2d 949, 958 (Fla. 1994). During trial, Bachelder testified that Corrina Bejar "was able to differentiate the difference between telling the truth and telling a lie." (Dkt. 10, Ex. 17, Vol. III at pg. 218). Bachelder was not commenting on the truthfulness of Corrina Bejar's statements or her credibility as a witness, but instead was merely indicating that Corrina Bejar had the ability to comprehend the difference between telling the truth and telling a lie.

Petitioner does not establish Bachelder's statement was inadmissible under Florida law. Therefore, he cannot establish that the failure to object was both deficient and prejudicial to the point of making the trial fundamentally unfair. Therefore, Ground Six fails to meet either of the *Strickland* prongs and must be denied.

**Ground Seven**

Petitioner asserts appellate counsel was ineffective in failing to raise a *Brady*[7] violation claim on direct appeal. The record shows that trial counsel did not raise a *Brady* violation claim in the trial court. Instead, counsel argued that the State's failure to provide the defense with the transcript of the victims' mother's statement to the police was a discovery violation (Dkt. 10, Ex. 16 at Exhibit "A"). Consequently, Petitioner could not challenge the trial court's ruling on appeal because trial counsel

---

[7]*Brady v. Maryland*, 373 U.S. 83 (1963).

failed to preserve the issue for appellate review.[8] Appellate counsel is not deemed ineffective for failing to raise issues unpreserved for appeal. *Medina v. Dugger*, 586 So.2d 317, 318 (Fla. 1991). An exception exists if appellate counsel fails to raise a claim, although not preserved for appeal, that presents a fundamental error. A fundamental error is an error that "reaches down into the validity of the trial itself to the extent that a verdict of guilty could not have been obtained without the assistance of the alleged error." *Kilgore v. State*, 688 So.2d 895, 898 (Fla. 1996) (citations omitted). Petitioner fails to establish fundamental error. Accordingly, Petitioner fails to show that his appellate counsel rendered ineffective assistance by failing to raise this unpreserved issue on appeal.

Moreover, Petitioner fails to establish prejudice as a result of appellate counsel's failure to raise a *Brady* violation claim because Petitioner fails to establish a *Brady* violation. *Brady* held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87. To establish a *Brady* violation, a defendant must prove: 1) that the Government possessed evidence favorable to the defense; 2) that the defendant did not possess the evidence and could not obtain it with any reasonable diligence; 3) that the prosecution suppressed the evidence; and, 4) that a reasonable probability exists that the outcome of the proceeding would have been different had the evidence been disclosed to the defense." *See Strickler v. Greene*, 527 U.S. 263, 280-281 (1999) (citations omitted); *Spivey v. Head*, 207 F.3d 1263, 1283 (11th Cir.) (citations omitted), *cert. denied*, 531 U.S. 1053 (2000).

A prosecutor does not violate *Brady* unless the "nondisclosure was so serious that there is a

---

[8]Petitioner does not allege that appellate counsel should have raised a claim of ineffective assistance of trial counsel for failing to raise a *Brady* violation claim.

reasonable probability that the suppressed evidence would have produced a different verdict."
*Strickler v. Greene*, 527 U.S. at 281-82. "When information is fully available to a defendant at the
time of his trial and his only reason for not obtaining and presenting the evidence to the court is his
lack of reasonable diligence, the defendant has no *Brady* claim." *United States v. Runyan*, 290 F.3d
223, 246 (2002)(quoting *United States v. Marrero*, 904 F.2d 251, 261 (5th Cir.1990) (internal
quotations omitted)). *See also, Halliwell v. Strickland*, 747 F.2d 607, 609 (11th Cir. 1984) (no *Brady*
violation where undiscovered evidence was reasonably available to defense), *cert. denied*, 472 U.S.
1011 (1985). Moreover, the Supreme Court has held that "the Constitution is not violated every time
the government fails or chooses not to disclose evidence that might prove helpful to the defense."
*Moon v. Head*, 285 F.3d 1301, 1314 (11th Cir. 2002) (citing *Kyles v. Whitley*, 514 U.S. 419, 436-37
(1995)).

For Petitioner to succeed on his *Brady* claim, he must demonstrate a "reasonable probability"
that, had favorable evidence been disclosed to his counsel, the result of the proceeding would have
been different." *United States v. Bagley*, 473 U. S. 667, 681 (1985). The issue is not whether
Petitioner would more likely than not have received a different verdict with the evidence, but
whether in its absence he received a fair trial--one resulting in a verdict worthy of confidence. *Moon*,
supra at 1310 (citing *Kyles*, 514 U.S. at 434). There was no *Brady* violation with respect to the
transcript of the statement made by the victims' mother to the police. Petitioner fails to satisfy prong
three and four for a *Brady* violation. There was no suppression of evidence. Petitioner was aware
of the victim's mother as a witness, and she was available during trial and testified. The transcript of
the victims' mother's statement to police was provided to Petitioner's attorney after the jury was
selected, but before opening statements and the presentation of the witnesses (Dkt. 10, Ex. 17, Vol. II

21

at pgs. 99-103). Therefore, Petitioner's counsel had the statement available to use to impeach the victims' mother at trial. *See United States v. Bencs*, 28 F.3d 555, 560 (6th Cir. 1994) ("*Brady* generally does not apply to delayed disclosure of exculpatory information, but only to complete failure to disclose.") (citations omitted), *cert. denied*, 513 U.S. 1117 (1995); *see also, United States v. Scarborough*, 128 F.3d 1373, 1376 (10th Cir. 1997) (as long as ultimate disclosure is made before it is too late for defendant to make use of any benefits of the evidence, due process is satisfied).

Furthermore, Petitioner wholly fails to establish a reasonable probability exists that the outcome of the trial would have been different had the evidence been disclosed to the defense earlier. There does not appear to be anything in the transcript of the mother's statement to the police which could have been used to impeach her at trial. (See Dkt. 10, Ex. 16 at Exhibit "B"; Ex. 17, Vol. II at pgs. 116-145; Vol. III at pgs. 146-155).

Accordingly, Ground Seven warrants no federal habeas relief.

**Ground Eight**

In Ground Eight, Petitioner essentially argues that the trial court violated his Sixth Amendment right to confront witnesses against him when the trial court prevented defense counsel from cross-examining the State's witness, Leinani McKenzie ("McKenzie"), regarding her prior allegation of sexual abuse by her brother (Dkt. 13 at pgs. 16-17). At trial, McKenzie testified that Petitioner had touched her "private parts", specifically, her "tits and crouch." (Dkt. 10, Ex. 17,Vol. III at pgs. 234-38). Petitioner's attorney cross-examined McKenzie as follows:

> Q. Good afternoon, Ms. McKenzie. Now, Ms. McKenzie, before you stood up there and you swore to tell the truth; is that right?
>
> A. Yes, sir.

22

Q. Okay. And do you know what that means?

A. Yes, sir.

Q. Okay. Have you ever said that someone has touched you in a wrong way that wasn't the truth?

A. Repeat that.

Q. Have you ever said that someone touched you in a bad or wrong way, and it wasn't the truth?

A. I don't understand.

Q. Okay. Do you have a brother named James?

A. Yes.

Q. Did you ever say that James touched you in a bad way?

A. I don't think so.

MR. ABDONEY: Judge, I object to the relevance of this line of questioning.

THE COURT: I'm going to allow it, but not a lot farther.

Q. (By Mr. Averbuck) Did you ever tell the police that James touched you in a bad way?

A. I don't think so.

Q. Did you ever tell your mother that?

MR. ABDONEY: Judge, again, same objection.

A. I don't think so.

THE COURT: Okay. That's far enough.

Q. (By Mr. Averbuck) When you say you don't think so, is that --

MR. ABDONEY: Judge, same objection.

Q. (By Mr. Averbuck) All right. Let me refine that question.

MR. AVERBUCK: I ask for some leeway here, because it goes to the credibility of the witness for this kind of a charge.

MR. ABDONEY: Judge, I'd ask that we approach --

THE COURT: Just ask a direct question.

MR. AVERBUCK: Okay.

THE COURT: And if she says yes or no, that's it.

MR. AVERBUCK: Okay.

Q. (By Mr. Averbuck) Did you ever say that your brother, James, had hunched you in bed?

MR. ABDONEY: Judge, objection, relevance.

A. That's what my --

THE COURT: That's not relevant.

MR. AVERBUCK: Judge, that's the exact kind of behavior --

MR. ABDONEY: Judge, I'd ask that we approach with argument.

THE COURT: Your objection is sustained.

MR. AVERBUCK: May I have a moment, Your Honor?

THE COURT: Yes.

Q. (By Mr. Averbuck) Okay. Ms. McKenzie, you mentioned -- you said Joe had touched you in bad ways.

A. Yes.

Q. Did that ever occur when there were other people around you?

A. I don't remember.

Q. Okay. Did it ever occur with your mom right there - -

A. No.

Q -- next to the room?

A. No.

Q. Okay. Did it ever occur when there was another girl there?

A. Probably just my grandma.

Q. Did it ever occur when another girl was sleeping next to you?

A. I don't know.

Q. You don't know?

A. I don't remember.

Q. Okay.

MR. AVERBUCK: Nothing further, Judge.

THE COURT: Thank you. Redirect?

MR. ABDONEY: No, sir.

THE COURT: All right. May this witness be excused?

MR. ABDONEY: Yes, sir.

THE COURT: You're excused. Please don't talk about your testimony with anybody, okay?

THE WITNESS: Yes, sir.

THE COURT: Thank you very much. (Witness steps down. )

MR. ABDONEY: The state rests.

(Dkt. 10, Ex. 17, Vol. III at pgs. 239-42).

"A criminal defendant states a violation of the Confrontation Clause by showing that he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, and thereby to expose to the jury the facts from which jurors . . . could appropriately draw inferences relating to the reliability of the witness." *Delaware v. Van Arsdall*, 475 U.S. 673, 680 (1986). Not every limitation on cross-examination, however, violates the Confrontation Clause. "The Sixth Amendment does not require unlimited inquiry into the potential bias of a witness. As long as sufficient information is elicited from the witness from which the jury can adequately assess possible motive or bias, the Sixth Amendment is satisfied." *United States v. Lankford*, 955 F.2d 1545, 1549 n.10 (internal citations and quotations marks omitted).

It is apparent from the record that the trial court did not prohibit the defense from cross-examining McKenzie regarding her prior claim of sexual abuse by her brother. The court allowed defense counsel, over objection, to ask McKenzie whether she had ever said her brother had touched her in a bad way, or whether she had ever told the police or her mother that her brother had touched her in a bad way. The only objection the court sustained was the objection to defense counsel's question "Did you ever say that your brother, James, had hunched you in bed?"[9] After defense counsel asked that question, and the objection to the question was sustained, he abandoned further questioning of McKenzie on the issue of her prior claim of sexual abuse by her brother. The record clearly refutes Petitioner's claim that he was denied the opportunity to confront McKenzie regarding her prior claim of sexual abuse by her brother. She was asked questions regarding that issue, and she

---

[9]Petitioner wholly fails to allege or demonstrate that the trial court's sustaining the State's objection to this question was erroneous.

denied that she had accused her brother of touching her in the wrong way.

Accordingly, Ground Eight does not merit federal habeas corpus relief.

## Conclusion

For the foregoing reasons, the Court finds that Petitioner is not entitled to federal habeas relief.

ACCORDINGLY, the Court **ORDERS** that:

1. The Petition for Writ of Habeas Corpus is **DENIED** (Dkt. 1).

2. The **Clerk** shall enter judgment against Petitioner, terminate all pending motions, and close this case.

**DONE and ORDERED** in Tampa, Florida, on ___July 22nd___, 2009.

JAMES D. WHITTEMORE
United States District Judge

SA:sfc
Copy to: Petitioner *pro se*
        Counsel of Record